IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO, EASTERN DIVISION

| | | |
|---|---|---|
| EUGENE JOHNSON | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | No. |
| | ) | |
| CITY OF EAST CLEVELAND, | ) | |
| MICHAEL C. PERRY, VINCENT K. | ) | |
| JOHNSTONE, D.J. MIKLOVICH, | ) | |
| PATRICIA LANE, CHARLES TEEL, | ) | |
| JOHN C. BRADFORD, TERRENCE | ) | |
| DUNN, CARMEN MARINO, | ) | |
| DEBORAH NAIMAN, and | ) | |
| CUYAHOGA COUNTY, | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

## COMPLAINT

Now comes the Plaintiff, EUGENE JOHNSON, by and through his attorneys,

Michael B. Pasternak and Brett Murner, and complain of Defendants CITY OF

EAST CLEVELAND, former East Cleveland Police Detective Sergeant MICHAEL

C. PERRY, former East Cleveland Police Detective VINCENT K. JOHNSTONE,

former East Cleveland Police Detective D.J. MIKLOVICH, former East Cleveland

Police Detective Sergeant PATRICIA LANE, former East Cleveland Police

Commander CHARLES TEEL, former East Cleveland Police Lieutenant JOHN C.

BRADFORD, former East Cleveland Police Sergeant TERRENCE DUNN, former

First Assistant at the Cuyahoga County Prosecutor's Office CARMEN MARINO,

former Assistant County Prosecutor at the Cuyahoga County Prosecutor's Office

DEBORAH NAIMAN, and CUYAHOGA COUNTY, as follows:

1

## Introduction

1.    Plaintiff, Eugene Johnson, spent two decades wrongfully incarcerated in prison for a murder that he did not commit. Arrested as teenager, he, along with his former co-defendants, Derrick Wheatt and Laurese Glover, were wrongfully convicted for the 1995 murder of Clifton Hudson in East Cleveland, Ohio.

2.    Plaintiff served over 20 years of his sentence before he was exonerated in 2015.

3.    Plaintiff was exonerated after exculpatory evidence came to light in police reports that had never previously been disclosed to him. It was only after his former co-defendants' post-conviction counsel obtained the police reports through a public records request in 2013 that this exculpatory evidence came to light. On the basis of this new evidence, which had been suppressed in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), the state court vacated the convictions of Mr. Wheatt, Mr. Glover, and Eugene Johnson and granted them a new trial in 2015. The charges against Plaintiff remained pending and Plaintiff remained on bond until August 2016, when all charges were finally dismissed.

4.    It was misconduct by East Cleveland police detectives and those working in concert with them that led to Plaintiff's wrongful conviction. This misconduct included but was not limited to witness manipulation; unduly suggestive witness identifications and photo lineups; and fabrication, destruction, and suppression of evidence. In addition, after Plaintiff was wrongfully convicted, misconduct by former Cuyahoga County prosecutors Carmen Marino and Deborah

2

Naiman in preventing the release of the suppressed police reports caused Plaintiff to be denied timely post-conviction relief and resulted in his continued incarceration.

5.     Plaintiff therefore brings this action pursuant to federal and Ohio law seeking redress for the wrongs done to them, as well as to deter future misconduct.

## Jurisdiction and Venue

6.     This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, and over his state-law claims pursuant to 28 U.S.C. § 1367.

7.     Venue is proper because the individual defendants reside within this district, and all of the events giving rise to the claims asserted herein occurred within this district.

## Parties

8.     Plaintiff Eugene Johnson is a 38 year old resident of East Cleveland, Ohio. At the time of his arrest in February 1995, he was just 17 years old and living with his family in East Cleveland, Ohio.

9.     Defendant City of East Cleveland (the "City") is an Ohio municipal corporation that operates the East Cleveland Police Department (the "Department"). The City is liable for all state law torts committed by the Defendant Officers while employed by the City pursuant to the doctrine of *respondeat superior*. The City is additionally responsible for the policies and practices of the City and Department that caused the violation of Plaintiff's constitutional rights.

3

10.     Defendant Michael C. Perry was at all times relevant to this Complaint an East Cleveland Police Detective Sergeant.

11.     Defendant Vincent K. Johnstone was at all times relevant to this Complaint an East Cleveland Police Detective.

12.     Defendant D.J. Miklovich was at all times relevant to this Complaint an East Cleveland Police Detective.

13.     Defendant Patricia Lane was at all times relevant to this Complaint an East Cleveland Police Detective Sergeant.

14.     Defendant Charles Teel was at all times relevant to this Complaint an East Cleveland Police Commander.

15.     Defendant John C. Bradford, #017, was at all times relevant to this Complaint an East Cleveland Police Lieutenant.

16.     Defendant Terrence Dunn was at all times relevant to this Complaint an East Cleveland Police Sergeant.

17.     At all times relevant herein, Defendants Perry, Lane, Teel, and Bradford supervised Defendants Johnstone and Miklovich.

18.     Defendants Perry, Johnstone, Miklovich, Lane, Teel, and Bradford are collectively referred to as the "Defendant Officers." At least one of the Defendant Officers and/or Defendant Dunn was, at all times relevant, a final policymaker, or had been delegated such authority, for the Defendant City.

19.     At all times relevant, Defendants Perry, Johnstone, Miklovich, Lane, Teel, Bradford, and Dunn acted under color of law and within the scope of their

4

employment for the Defendant City and the Department. They are sued in their individual capacities.

20.     Defendant Carmen Marino was at all times relevant to this Complaint a First Assistant with the Cuyahoga County Prosecutor's Office ("Prosecutor's Office"). Defendant Marino was, at all times relevant, a final policymaker, or had been delegated such authority, for the Defendant County, with respect to the subject areas relevant to his acts as alleged herein.

21.     Defendant Deborah Naiman was at all times relevant to this Complaint an Assistant County Prosecutor with the Cuyahoga County Prosecutor's Office. Defendant Naiman was, at all times relevant, a final policymaker, or had been delegated such authority, for the Defendant County, with respect to the subject areas relevant to her acts as alleged herein.

22.     At all times relevant, Defendants Marino and Naiman acted under color of law and within the scope of their employment for the Cuyahoga County Prosecutor's Office and Cuyahoga County. They are sued in their individual capacities.

23.     Defendant Cuyahoga County ("County") is a governmental entity in the State of Ohio. The County is liable for all state law torts committed by Defendants Marino and Naiman while employed by the County and the Prosecutor's Office pursuant to the doctrine of *respondeat superior*. The County is additionally responsible for the policies and practices of the County and Prosecutor's Office that caused the violation of Plaintiffs' constitutional rights.

5

## Background

24.     Eugene Johnson was born in Cleveland, Ohio, and grew up in East Cleveland.

25.     Mr. Wheatt, Mr. Glover, and Eugene Johnson were friends, and they knew each other from living in the same neighborhood.

26.     In February 1995, Mr. Wheatt was 17 years old, Mr. Glover was 16 years old, and Mr. Johnson was 17 years old. They were students at Shaw High School in East Cleveland.

## The Murder of Clifton Hudson

27.     In the early evening hours of February 10, 1995, 19 year-old Clifton Hudson was shot and killed outside 1706 Strathmore Avenue in East Cleveland, Ohio.

28.     The man who shot and killed Mr. Hudson fled on foot and has never been apprehended.

29.     Neither Plaintiff nor Mr. Wheatt or Mr. Glover had anything to do with the murder of Clifton Hudson. All three of them are completely innocent.

30.     Plaintiff, Mr. Glover and Mr. Wheatt were merely witnesses to the shooting. They were traveling in Mr. Glover's black GMC Jimmy north on Strathmore Avenue when Mr. Glover stopped at a stop sign next to a post office parking lot, before the bridge at Strathmore and Manhattan Avenues.    The sound of gunfire scared Mr. Glover, compelling him drive away from the scene.

6

31.     A 14 year-old girl named Tamika Harris was also a witness to the shooting. Ms. Harris witnessed the shooting from the other side of the bridge from where Plaintiff and Mr. Wheatt and Mr. Glover were. She saw the shooter approach Mr. Hudson on foot, but her view of where the shooter came from was obscured by Mr. Glover's vehicle.

### Defendant Officers' Manipulation and Fabrication of Tamika Harris's Statement

32.     The police, including Defendants Perry, Johnstone, Miklovich, Teel, and Lane, arrived at the scene soon after the shooting.

33.     Almost immediately after arriving on the scene, police spoke with Ms. Harris. Ms. Harris was taken to the police station.

34.     Defendant Lane interviewed Ms. Harris very shortly after the shooting on February 10, 1995.

35.     In that interview, Ms. Harris reported that there was a black 4x4-type vehicle at the scene and that she thought the shooter came from the vehicle.

36.     Ms. Harris did not identify the make or model of the vehicle.

37.     Ms. Harris stated that she did not see and could not describe the persons in the vehicle.

38.     Ms. Harris gave a description of the shooter that did not match Plaintiff or Mr. Wheatt or Mr. Glover.

39.     When asked by Defendant Lane if she could identify the shooter, Ms. Harris responded negatively.

7

40. Based on Ms. Harris's initial statement, East Cleveland police began searching for a 4x4-type vehicle.

41. Later in the evening on February 10, 1995, one or more of the Defendant Officers saw Mr. Glover's GMC Jimmy parked in the driveway of his home a few blocks away from the scene and just one block away from the police station.

42. Based on nothing other than Ms. Harris' statement that she saw a black 4x4-type vehicle at the scene of the shooting, and the fact that Mr. Glover had a 4x4-type vehicle, the Defendant Officers, including Defendants Johnstone, Miklovich, and Perry, arrested Mr. Wheatt and Mr. Glover very late at night.

43. There was no probable cause to arrest Mr. Wheatt and Mr. Glover.

44. The Defendant Officers impounded the GMC Jimmy and took a photo of it.

45. Mr. Wheatt and Mr. Glover were handcuffed, placed into separate police cars, and transported to the police station to be interrogated.

46. The Defendant Officers, including Defendants Perry, Johnstone, and Miklovich, interrogated Mr. Wheatt and Mr. Glover separately at the police station in the late evening hours of February 10, 1995 and early morning hours of February 11, 1995.

47. Even though Mr. Glover was a juvenile, the Defendant Officers, including Defendants Perry, Johnstone, and Miklovich, interrogated him without a parent present.

8

48. During the interrogations, Mr. Wheatt and Mr. Glover each separately denied involvement in the crime.

49. During the interrogations, the Defendant Officers, including Defendants Perry, Johnstone, and Miklovich, repeatedly tried to get Mr. Wheatt and Mr. Glover to falsely confess to the shooting, by, among other things: falsely telling them that they had numerous eyewitnesses implicating them in the shooting; falsely telling them that their friends had implicated them; and asking them the same questions over and over again in an attempt to force them into admitting to a crime they did not commit.

50. Mr. Wheatt and Mr. Glover did not confess, because they were innocent.

51. Instead, Mr. Wheatt and Mr. Glover each separately and independently told the Defendant Officers, including Defendants Perry, Johnstone, Miklovich, and Lane, that they were only witnesses to the shooting.

52. The Defendant Officers arrested Plaintiff Eugene Johnson on the morning of February 11, 1995, and they brought him to the police station for interrogation. There was no probable cause for Mr. Johnson's arrest, either, because all Defendant Officers knew at that point was that Mr. Wheatt, Mr. Glover, and Mr. Johnson were witnesses to the crime.

53. During his interrogation, Plaintiff conveyed the same thing to the Defendant Officers that Mr. Wheatt and Mr. Glover did: the three juveniles did not commit the murder, but they were witnesses to it.

9

54.    The Defendant Officers took photos of Mr. Wheatt, Mr. Glover, and Mr. Johnson in the police station.

55.    In those photos, Plaintiff and Mr. Wheatt and Mr. Glover were wearing the same clothes they were wearing when they were arrested, and they were standing in front of lockers in the police station. These photos taken by Defendant Officers made it obvious that Plaintiff and Mr. Wheatt and Mr. Glover were in police custody.

56.    After the Defendant Officers had arrested Mr. Wheatt, Mr. Glover, and Mr. Johnson, Ms. Harris was brought to the police station on February 11, 1995 and questioned again by the Defendant Officers, including Defendants Perry, Johnstone, and Miklovich.

57.    The Defendant Officers, including Defendants Perry, Johnstone, and Miklovich, engaged in unduly suggestive, coercive and manipulative questioning of Ms. Harris. Their improper conduct toward Ms. Harris, included, but was not limited to, asking her leading questions, providing information about the crime that she did not know, and providing information tending to identify Mr. Wheatt, Mr. Glover, and Mr. Johnson.

58.    The Defendant Officers, including Defendants Perry, Johnstone, and Miklovich, showed Ms. Harris the impounded GMC Jimmy in the police station garage and asked her to identify it. In order to manipulate her into identifying the vehicle as the one she saw at the scene of the shooting, it was the only vehicle that

they showed her, and the Defendant Officers told her that it was the vehicle of the suspects they already had in custody.

59.     As a result of their unduly suggestive identification procedure, Ms. Harris was manipulated into identifying the GMC Jimmy as the vehicle she saw at the scene.

60.     During their interview with Ms. Harris, Defendant Officers, including Defendants Perry, Johnstone, and Miklovich, provided information to her, which she did not know and had not provided, and which tended to inculpate Plaintiff and Mr. Wheatt and Mr. Glover. The information that the Defendant Officers provided to Ms. Harris was designed to falsely implicate Plaintiff.

61.     The Defendant Officers, including Defendants Perry, Johnstone, and Miklovich, engaged in unduly suggestive, coercive, and manipulative questioning of Ms. Harris, including but not limited to feeding her information about the crime in order to falsely implicate Plaintiff and Mr. Wheatt and Mr. Glover and fabricate evidence against them.

62.     Furthermore, even though Ms. Harris said that she did not see the shooter's face, Defendant Officers, including Defendants Perry, Johnstone, and Miklovich, created an unduly suggestive photo array for her to view.

63.     The Defendant Officers intentionally set out to make this photo array misleading because the only photos in it were the pictures of Plaintiff and Mr. Weaver and Mr. Glover had been taken at the police station. These three photos

11

were the only photos of potential suspects that Ms. Harris was shown; she was not shown any other photos.

64.     Moreover, when the Defendant Officers, including Defendants Perry, Johnstone, and Miklovich, showed the photos of Plaintiff and Mr. Wheatt and Mr. Glover to Ms. Harris, they told her words to the effect that they had the right suspects in custody, and that she just needed to pick one out as the shooter.

65.     The Defendant Officers, including Defendants Perry, Johnstone, and Miklovich, also conveyed to Ms. Harris before they showed her the photo spread that they knew what was going on and said words to the effect that "these guys did it" and they "had them in jail."

66.     Defendant Perry or one of the other Defendant Officers pointed to Mr. Johnson's photo to get Ms. Harris to identify him as the shooter, despite the fact that he did not match Ms. Harris's description of the shooter and she had already said that she did not see the shooter's face.

67.     The Defendant Officers, including Defendants Perry, Johnstone, and Miklovich, also falsely told Ms. Harris words to the effect that "the other two," referring to Mr. Wheatt and Mr. Glover, had "gunpowder on them."

68.     All of this was done to manipulate Ms. Harris and ensure that she would select and identify all these juveniles and falsely implicating them. Because of this improper and unduly suggestive photo array, Ms. Harris picked Plaintiff's photo.

12

69.     The Defendant Officers, including Defendants Perry, Johnstone, and Miklovich, interviewed Ms. Harris and had her sign a statement falsely implicating Plaintiff and Mr. Wheatt and Mr. Glover in the absence of a parent or guardian, even though she was only 14 years old.

70.     The Defendant Officers' misconduct relating to Ms. Harris included but was not limited to the fabrication of her statement falsely implicating Plaintiff and Mr. Wheatt and Mr. Glover.

71.     As a supervisor, Defendant Perry knew about, participated in, encouraged, and condoned the actions of Defendants Miklovich and Johnstone, as described above. Other supervisors, including Defendants Teel and Lane, also knew about, encouraged, and condoned the conduct of other Defendant Officers.

72.     The Defendant Officers, including Defendants Perry, Johnstone, Miklovich, Teel, and Lane, withheld information concerning their misconduct, including but not limited to the fabrication of Ms. Harris's statements, the unduly suggestive photo array, and the manipulation of Ms. Harris, from the Plaintiff, Mr. Wheatt and Mr. Glover, their defense counsel, and prosecutors.

73.     The Defendant Officers never disclosed any of this obviously exculpatory evidence to Plaintiff, Mr. Wheatt and Mr. Glover, defense counsel, and these individuals did not know about this exculpatory evidence until after Plaintiff's trial and conviction.

13

### The Defendant Officers Withheld Exculpatory Evidence
### Obtained from One or More of the Petty Brothers

74.    On or about February 12, 1995, Defendant Bradford received information from a woman named Monica Salters, who was the mother of two boys named Eddie Dante Petty and Gary Petty. Ms. Salters and her sons lived near the scene of the crime.

75.    Defendant Bradford learned from Ms. Salters that Dante witnessed the shooting; specifically, that as Dante was walking north on Strathmore Avenue, he saw the shooter come out of the post office parking lot on the east side of Strathmore Avenue, walk towards the victim who was standing on the other side of the street, take a gun out of his pocket, and begin shooting at the victim. According to Defendant Bradford's police report, Dante further stated that he had seen the suspect before, when the suspect was visiting a female classmate at his school, and that the suspect was or may have been the brother of the female classmate.

76.    Defendant Bradford documented this exculpatory information in a police report dated February 12, 1995.

77.    Defendant Bradford placed this police report in the investigative file relating to the Hudson murder.

78.    Defendant Bradford communicated the information from Ms. Salters to the other detectives investigating the crime, including Defendants Johnstone, Perry, Miklovich, and their supervisors, Defendants Lane and Teel.

79.    Defendant Johnstone knew about the information that Ms. Salters had provided to Lt. Bradford.

14

80. Defendant Miklovich knew about the information that Ms. Salters had provided to Lt. Bradford.

81. Defendant Perry knew about the information that Ms. Salters had provided to Lt. Bradford.

82. Defendant Lane knew about the information that Ms. Salters had provided to Lt. Bradford.

83. Defendant Teel knew about the information that Ms. Salters had provided to Lt. Bradford.

84. Defendant Johnstone saw Lt. Bradford's report dated February 12, 1995.

85. Defendant Miklovich saw Lt. Bradford's report dated February 12, 1995.

86. Defendant Perry saw Lt. Bradford's report dated February 12, 1995.

87. Defendant Lane saw Lt. Bradford's report dated February 12, 1995.

88. Defendant Teel saw Lt. Bradford's report dated February 12, 1995.

89. On or about February 15, 1995, Defendants Miklovich and Johnstone went to the home of Ms. Salters and her sons to interview them regarding what they knew about the crime and what they told Defendant Bradford.

90. During this interview, one of the Petty brothers told Defendants Miklovich and Johnstone that: on the day of the shooting, he was walking towards 1706 Strathmore Avenue when he saw a man exit the driveway of the post office parking lot, walk across the street towards another man, and shoot him.

91.     This evidence was apparently exculpatory because one or more of the Petty brothers had a clear view to the shooting, from the opposite side of the bridge embankment as Tamika Harris, and their view was not blocked by the GMC Jimmy stopped at the stop sign next to the post office parking lot. Unlike Ms. Harris, one or more of the Petty brothers had a clear view of the post office parking lot and the rear of the GMC Jimmy and could see that the shooter came from the post office parking lot and not the vehicle.

92.     Defendants Miklovich and Johnstone documented this exculpatory evidence from their interview with Ms. Salters and her son in a police report dated February 15, 1995.

93.     Defendant Perry saw Miklovich and Johnstone's report dated February 15, 1995 and signed it.

94.     Defendants Miklovich, Johnstone, and Perry placed this report dated February 15, 1995 in the investigative file relating to the Hudson murder.

95.     Defendants Miklovich, Johnstone, and Perry communicated this exculpatory evidence to Defendants Lane and Teel.

96.     Defendant Lane saw Miklovich and Johnstone's report dated February 15, 1995.

97.     Defendant Teel saw Miklovich and Johnstone's report dated February 15, 1995.

98.     Defendant Lane knew about the information from one of the Petty brothers contained in the report dated February 15, 1995.

99.    Defendant Teel knew about the information from one of the Petty brothers contained in the report dated February 15, 1995.

100.    However, Defendants Miklovich, Perry, Johnstone, Lane, and Teel withheld the report dated February 15, 1995, Defendant Bradford's report dated February 12, 1995, and the related exculpatory evidence from the Plaintiff, Mr. Wheatt, Mr. Glover, the defense counsel, and prosecutors

101.    Defendant Bradford withheld his February 12, 1995 report and the information he learned from Ms. Salters from the Plaintiff, Mr. Johnson, Mr. Wheatt, Mr. Glover,  the defense counsel, and prosecutors.

102.    Additionally, Defendants Teel and Lane, who were supervisors of the other Defendant Officers, knew about, condoned, and approved of Defendants Miklovich, Perry, Johnstone, and Bradford's actions.

103.    The Defendant Officers agreed amongst themselves to withhold the apparently exculpatory evidence from Ms. Salters and one or more of the Petty brothers from Plaintiff, Mr. Johnson,  the defense counsel, and prosecutors.

104.    Plaintiff, Mr. Johnson, the defense counsel, and prosecutors did not know of the exculpatory information provided by one or more of the Petty brothers until long after Plaintiff's trial and conviction.

### The Defendant Officers Withheld Exculpatory Evidence Obtained from Derek Bufford

105.    On or about February 13, 1995, Defendants Lane and Teel interviewed Derek Bufford, Clifton Hudson's brother.

106.    According to Defendants' Lane and Teel's police report, Mr. Bufford told Defendants Lane and Teel that both he and his brother Clifton had recently been threatened by unknown men. Mr. Bufford told them that some men had pulled a shotgun on Mr. Hudson just a day before the shooting. Mr. Bufford also told Defendants Lane and Teel that a few days before the shooting, some unknown men in a grey Chevy Cavalier pulled up to him and started shooting at him, and that he escaped by ducking into a local retail store. This shooting occurred only blocks away from where Mr. Hudson was murdered the next day.

107.    Defendants Lane and Teel believed that these incidents were related to Mr. Hudson's murder, because these unknown men had threatened and attempted to kill Mr. Hudson and Mr. Bufford within days of the murder.

108.    Defendants Lane and Teel showed Mr. Bufford pictures of Plaintiff, Mr. Wheatt, Mr. Glover, and the GMC Jimmy. Mr. Bufford did not identify the Plaintiff or Mr. Wheatt or Mr. Glover as the individuals who had shot at him.

109.    Neither Plaintiff nor Mr. Wheatt or Mr. Glover had a Chevy Cavalier.

110.    The information provided by Mr. Bufford was apparently exculpatory because it indicated that Mr. Hudson had been involved in an ongoing feud with persons other than Plaintiff or Mr. Wheatt or Mr. Glover.

111.    Defendants Lane and Teel documented the information from Mr. Bufford in a police report dated February 13, 1995.

112.    Defendants Lane and Teel placed this police report in the investigative file relating to the Hudson murder.

113.    Defendants Lane and Teel communicated this information to the other detectives investigating the crime, including Defendants Johnstone, Perry, and Miklovich.

114.    Defendant Johnstone saw Defendants Lane and Teel's report dated February 13, 1995.

115.    Defendant Perry saw Defendants Lane and Teel's report dated February 13, 1995.

116.    Defendant Miklovich saw Defendants Lane and Teel's report dated February 13, 1995.

117.    Defendant Johnstone knew about this information from Mr. Bufford.

118.    Defendant Perry knew about this information from Mr. Bufford.

119.    Defendant Miklovich knew about this information from Mr. Bufford.

120.    However, Defendants Lane, Teel, Miklovich, Perry, and Johnstone withheld the February 13, 1995 report and the related exculpatory evidence from the Plaintiff, Mr. Johnson, the defense counsel, and prosecutors.

121.    The Defendant Officers agreed amongst themselves to withhold the apparently exculpatory evidence from Mr. Bufford from the Plaintiff, Mr. Johnson , the defense counsel, and prosecutors.

122.    Plaintiff, Mr. Johnson, the defense counsel, and prosecutors did not know of the exculpatory information provided by Derek Bufford until long after Plaintiff's trial and conviction.

19

123. None of the Defendant Officers ever investigated any of the information they received from one or more of the Petty brothers or Mr. Bufford.

## The Wrongful Convictions of Eugene Johnson

124. Mr. Wheatt, Mr. Glover, and Mr. Johnson were tried for the murder of Clifton Hudson in January 1996. The prosecution's case was weak, and the key piece of evidence against them was the fabricated testimony of Tamika Harris.

125. The State's case was so weak that, during trial, the prosecution offered Mr. Wheatt and Mr. Glover a plea bargain in exchange for their cooperation in testifying against Plaintiff, including probation for Mr. Wheatt and complete dismissal of all charges against Mr. Glover. Mr. Wheatt and Mr. Glover rejected the plea offer and continued to maintain their innocence, even though they were teenagers facing life imprisonment if they were convicted.

126. Plaintiffs and Mr. Johnson were wrongfully convicted of murder on January 18, 1996 as a result of Defendant Officers' misconduct. Mr. Glover was sentenced to 15 years to life imprisonment, and Mr. Wheatt and Mr. Johnson were sentenced to 18 years to life imprisonment.

127. Throughout the conviction and sentencing, Plaintiff and Mr. Wheatt and Mr. Glover maintained their innocence.

128. Had the Defendant Officers disclosed their misconduct, including but not limited to their withholding of exculpatory evidence and fabrication of evidence to prosecutors, Plaintiff, or his counsel, the prosecution would not have been pursued and Plaintiff would not have been convicted.

129.    If the exculpatory evidence described above had not been withheld during trial, the State's case at trial would have been thoroughly undermined, and the result of the trial would have been different.

130.    At all times leading up to and prior to Plaintiff's trial, it was the policy of the attorneys in the Cuyahoga County Prosecutor's Office to disclose all exculpatory evidence of which they were aware by communicating it to the defense counsel prior to trial.

131.    The only prosecutor who worked on Plaintiff's trial was Michael Horn.

132.    The exculpatory evidence described in the preceding paragraphs was not provided by Defendant Officers or any member of the East Cleveland Police Department to Mr. Horn prior to trial or Plaintiff's conviction.

133.    The exculpatory evidence described in the preceding paragraphs was not provided by Defendant Officers or any member of the East Cleveland Police Department to any member of the Prosecutor's Office prior to trial or Plaintiff's conviction.

### Post-Trial Misconduct By Defendants Marino, Naiman, and Dunn

134.    In 1998, as part of an initial post-conviction investigation, a public records request was sent to the City of East Cleveland. The request sought copies of all police and investigatory records related to the murder of Clifton Hudson.

135.    At this time, Plaintiff's criminal convictions had become final. Plaintiff's conviction had been affirmed by the state court of appeals, and the Ohio Supreme Court had denied review. No motion for new trial or petition for post-

21

conviction relief had been filed. There was nothing pending in court in Plaintiff's criminal case.

136. The Defendant Officers learned about the 1998 public records request to the City of East Cleveland.

137. The Defendant Officers informed Defendants Marino and Naiman about the public records request.

138. Neither Defendants Marino nor Naiman had any involvement with the prosecution or trial of Plaintiff or Mr. Wheatt or Mr. Glover. Nor did they have any involvement with any post-conviction or habeas proceedings of Plaintiff.

139. After learning of the 1998 public records request, Defendant Officers, Defendant Dunn, Defendant Marino, and Defendant Naiman conferred and agreed with each other to withhold the exculpatory police reports from Plaintiffs and prevent the disclosure of all police and investigatory records in response to the request.

140. In June 1998, Defendants Marino and Naiman sent a letter to Defendant Dunn at the East Cleveland Police Department directing him not to release the police or investigatory records relating to the murder of Clifton Hudson. Defendants Marino and Naiman "directed" the Department to turn over all copies of the police file to the Prosecutor's Office.

141. Pleading additionally and in the alternative: Upon learning of the public records request to the City of East Cleveland, Defendants Marino and

22

Naiman, then prosecutors at the Cuyahoga County Prosecutor's Office, intervened to stop the City and the Department from releasing any records.

142.   Defendant Dunn turned over a copy of the police reports and investigatory records to Defendants Marino and Naiman, as Defendants Marino and Naiman had "directed" in their June 1998 letter.

143.   Defendants Marino and Naiman reviewed the police reports and investigatory records.

144.   Defendants Marino and Naiman saw the information provided by the Petty brothers and Derek Bufford, which they knew was exculpatory.

145.   Defendants Marino and Naiman took these actions despite the fact that they had no authority under state law—or any law—to direct the Department not to release records in response to a public records request.

146.   Defendants Marino and Naiman took these actions despite the fact that they had no authority under state law—or any law—to direct the Department to turn over all copies of the police file to the Prosecutor's Office.

147.   Defendants Marino and Naiman had no authority whatsoever to interfere with the response of a separate and independent governmental entity (the East Cleveland Police Department and the City of East Cleveland) to a public records request. Nor were Defendants Marino or Naiman enforcing any law when they took these actions.

148.   In addition, Defendants Marino and Naiman, in their letter to the East Cleveland Police Department, advised the Department that "said police file and its

contents are not public record, thus any release could constitute a willful [sic] violation of the law."

149.  It would not have been a violation of the law for the City or the Department to release the records.

150.  As a result of Defendants Marino and Naiman's actions, the City and the Department did not release the file relating to the Hudson murder, which contained the exculpatory reports relating to the Petty brothers and Derek Bufford.

151.  Defendants Marino and Naiman had no authority to direct or control the public records request made upon Defendant East Cleveland Police Department and Defendant the City of East Cleveland.

152.  Defendants Marino and Naiman had no authority whatsoever to interfere with the response of a separate and independent governmental entity (the East Cleveland Police Department and the City of East Cleveland) to a public records request.  Nor were Defendants Marino or Naiman enforcing any law when they took these actions.

153.  In addition, Defendants Marino and Naiman, in their letter to the East Cleveland Police Department, advised the Department that "said police file and its contents are not public record, thus any release could constitute a willful [sic] violation of the law."

154.  It would not have been a violation of the law for the City or the Department to release the records.

24

155.    As a result of Defendants Marino and Naiman's actions, the City and the Department did not release the file relating to the Hudson murder, which contained the exculpatory reports relating to the Petty brothers and Derek Bufford.

156.    Defendants Marino and Naiman did not disclose any of this information to the Plaintiff, Mr. Johnson, their counsel, the original trial prosecutor, Michael Horn, or to any court.

157.    Without having knowledge of the suppressed/Brady material, Plaintiff filed a Motion for Leave to File Motion for New Trial on January 23, 2004 in Cuyahoga Cty. Case No. 324431.

158.    This Motion was based upon the changed testimony of the lone, known eyewitnesses at the time, Tamika Harris.

159.    In the Affidavit attached to the pleading and subsequent testimony, Ms. Harris stated that her prior Trial testimony was incorrect and she was pressured into the testimony by members of the East Cleveland Police Department.

160.    On September 17, 2004, Plaintiff's Motion for New Trial was granted.

161.    In the months of litigation preceding the granting of Plaintiff's Motion, the Cuyahoga County Prosecutor's office through written pleadings and testimony continuously denied the validity of Plaintiff's claim.

162.    At no point in this litigation did any prosecutor or representative of the Cuyahoga County Prosecutor's Office make mention or intimate as to the existence of the now known Brady material, even though it was in their possession in 1999.

163.   In fact, the Cuyahoga County Prosecutor's office appealed the trial court's granting of the Motion for New Trial to the Eighth District Court of Appeals.

164.   This appellate case proceeded with a full briefing schedule and oral arguments.

165.   Once again, at no time during this state appellate litigation did any prosecutor or representative of the Cuyahoga County Prosecutor's Office make mention or intimate as to the existence of the now known Brady material, even though it was in their possession in 1999.

166.   The Eighth District Court of Appeals ruled against Plaintiff, overturned the Trial Court's decision, and he was ordered back into custody to serve the remainder of his sentence.

167.   Plaintiff, through his attorneys, filed a discretionary appeal to the Ohio Supreme Court.

168.   The Cuyahoga County Prosecutor's Office opposed that Motion and the Supreme Court of Ohio denied jurisdiction on April 4, 2006.

169.   Once again, at no time during this state appellate litigation did any prosecutor or representative of the Cuyahoga County Prosecutor's Office make mention or intimate as to the existence of the now known Brady material, even though it was in their possession in 1999.

170.   On November 21, 2006, Plaintiff filed a Writ of Habeas Corpus in US District Court (Northern District of Ohio), Case No. 1:06-cv-02816-DAK.

171.   The Ohio Attorney General's office defended this lawsuit along with the Cuyahoga County prosecutor's office.

172.   Both the above agencies continued to deny Plaintiff's claims and the litigation was filed on their behalf through multiple pleadings and a hearing.

173.   Plaintiff's writ was denied on September 21, 2009.  As per the Judgment Entry of denial, Plaintiff was able to overcome his procedural defaults by a showing of actual innocence.  However, his writ failed due to lack of cognizable federal claim, e.g. Brady.

174.   At no point in this federal litigation did either the Cuyahoga County Prosecutor's Office or the Ohio Attorney General make mention or intimate as to the existence of the now known Brady material, even though it was in the possession of the Cuyahoga County Prosecutor's Office since 1999.

175.   On January 12, 2009, Plaintiff filed another Motion for Leave to File Motion for New Trial in Cuyahoga Cty. Case No. 324431.

176.   This Motion was based upon scientific advances in gunshot residue testing since the time of Plaintiff's Trial in 2006.

177.   On June 23, 2009, Plaintiff's Motion for New Trial was denied.

178.   In the months of litigation preceding the denial of Plaintiff's Motion, the Cuyahoga County Prosecutor's office through written pleadings and testimony continuously denied the validity of Plaintiff's claim.

179.   At no point in this litigation did any prosecutor or representative of the Cuyahoga County Prosecutor's Office make mention or intimate as to the existence

of the now known Brady material, even though it was in their possession since 1999.

180.    Plaintiff appealed the decision of the trial court in state court.  This appellate case also went through the usual written briefing and oral argument.

181.    The Eighth District Court of Appeals ruled against Plaintiff, upheld the Trial Court's decision, and he was ordered back into custody to serve the remainder of his sentence.

182.    Plaintiff, through his attorney, filed a discretionary appeal to the Ohio Supreme Court.

183.    The Cuyahoga County Prosecutor's Office opposed that Motion and the Supreme Court of Ohio denied jurisdiction on February 28, 2011.

184.    Once again, at no time during this state appellate litigation did any prosecutor or representative of the Cuyahoga County Prosecutor's Office make mention or intimate as to the existence of the now known Brady material, even though it was in their possession in 1999.

185.    At no time during the litigation and appeal of Plaintiff's Motions for New Trial (2004 and 2009) or federal Writ of Habeas Corpus litigation did the Cuyahoga County Prosecutor's Office make mention or intimate as to the existence of the now known Brady material, even though it was in their possession since 1999.

186.   The now known Brady material would have been probative, relevant, and dispositive to all of the above actions.  The continued denial of access to this material helped maintain the unjust incarceration of Plaintiff for over 17 years.

187.   As a result of Defendants' actions, Plaintiffs spent an additional 17 years wrongfully imprisoned before these reports and the exculpatory information therein finally came to light.

### The Exculpatory Police Reports Finally Come to Light

188.   In 2013, a public records request to the East Cleveland Police Department requesting all documents related to the murder of Clifton Hudson.

189.   Subsequently, the Department responded and produced to Plaintiff and his counsel, for the first time, police reports relating to the investigation.

190.   The police reports finally produced by the Department included the exculpatory police reports containing information from one or more of the Petty brothers and Derek Bufford.

191.   Apparently, the Department had kept copies of at least some of the police reports, despite Defendants Marino and Naiman's 1998 letter.

192.   Because of Defendant Officers, Marino, Naiman, and Dunn's misconduct, Plaintiffs were deprived of newly discovered, exculpatory evidence that they could use to successfully litigate motions for new trial, post-conviction petitions, and petitions for habeas relief from 1998 through 2013.

193.   Prior to 2013, Plaintiffs filed and litigated motions for new trial, post-conviction petitions, and petitions for habeas relief which were unsuccessful because

29

they did not have the exculpatory police reports and evidence from the Petty brothers and Derek Bufford.

## Plaintiffs' Exoneration

194.    After Plaintiffs obtained the exculpatory police reports, Plaintiff filed a new motion for new trial and petition for post-conviction relief in Ohio state court.

195.    On the basis of the newly discovered evidence, which was found to have been withheld from Plaintiff and Mr. Johnson in violation of their due process rights, Plaintiff's and Mr. Johnson's convictions were vacated in 2015 and they were granted a new trial.

196.    Plaintiff and Mr. Johnson remained on bond and GPS monitoring while the charges were pending against them until the dismissal of the charges on August 2016.

## Plaintiffs' Injuries

165.    As a direct and proximate cause of Defendants' acts, Plaintiff wrongfully served approximately 20 years in prison.

166.    Plaintiff suffered loss of education, job training, employment, and wages during his incarceration.

167.    Plaintiff lost the friendship and companionship of others, including their family.

168.    Plaintiff has suffered mental and psychological stress as a result of being publicly and falsely prosecuted for murder, and as a result of a reasonable fear that they would spend the remainder of their lives in prison for a murder they did not commit.

169.    As a direct and proximate result of Defendants' acts, Plaintiff suffered damages and injuries for which they are entitled to compensatory damages in an amount to be determined at trial.

170.    Defendants' acts were intentional, malicious, deliberate, reckless, wanton and/or cruel, such as to justify and award of punitive damages to Plaintiffs.

171.    Plaintiff furthermore suffered other injuries set forth in the other paragraphs of this Complaint.

### Count I: Federal Law – Fourteenth Amendment
### Due Process

172.    Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

173.    In the manner described more fully above, the Defendants, while acting individually, jointly, and in conspiracy with each other, deprived Plaintiff of his constitutional rights to due process and a fair trial.

174.    In the manner described more fully above, the Defendant Officers deliberately failed to disclose and withheld and/or suppressed exculpatory evidence

31

from Plaintiff, his counsel, and prosecutors, among others, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

175. In the manner described more fully above, the Defendant Officers knowingly fabricated false evidence, including but not limited to the statements and testimony of Tamika Harris and police reports, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

176. In the manner described more fully above, the Defendant Officers violated Plaintiff's constitutional right to be free from identification procedures so unnecessarily suggestive and conducive to irreparable mistaken identification that the identification's use violates due process of law.

177. The Defendant Officers' misconduct directly resulted in the unjust criminal conviction of Plaintiff, thereby denying him his constitutional rights to due process and a fair trial guaranteed by the U.S. Constitution. By their actions, the Defendant Officers thereby misled and misdirected the criminal prosecution of Plaintiffs. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued, and there is a reasonable probability that they would not have been convicted.

178. The constitutional injuries complained-of herein were also proximately caused by the intentional misconduct of the supervisory defendants, including Defendants Teel and Lane, or when they were deliberately, recklessly indifferent to

their subordinates' misconduct, knowing that turning a blind eye to that misconduct would necessarily violate Plaintiff's constitutional rights.

179.    Specifically, these supervisory defendants, including Defendants Teel and Lane, were aware of and facilitated, condoned, and oversaw the unconstitutional measures used by other Defendants to obtain Tamika Harris's false testimony, or were deliberately, willfully, or recklessly indifferent to their subordinates' unconstitutional tactics.

180.    Moreover, these supervisory defendants, including Defendants Teel and Lane, were aware of and facilitated, conducted, and oversaw the withholding of exculpatory evidence, but failed to disclose that information, or were deliberately, willfully or recklessly indifferent to their subordinates' unconstitutional actions in withholding exculpatory evidence.

181.    In the manner described more fully above, Defendants Marino Naiman, and Dunn deliberately failed to disclose and withheld and/or suppressed exculpatory evidence from Plaintiff, his counsel, and prosecutors, among others, and prevented such evidence from being disclosed by the City of East Cleveland, after Plaintiff's convictions became final and no adversarial proceedings were ongoing.

182.    Additionally, in the manner described more fully above, the Defendant Officers, Dunn, Marino, and Naiman violated Plaintiff's rights to due process after trial. The withholding and suppression of the exculpatory police reports violated fundamental fairness and contravened fundamental principles of justice.

33

183. The Defendants were acting under color of law and within the scope of their employment when they took these actions.

184. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others.

185. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Defendant City and the Department in that East Cleveland police officers regularly used unconstitutional measures to falsely implicate criminal suspects, including by withholding and/or suppressing exculpatory evidence, fabricating evidence, feeding information to witnesses, engaging in use of unduly suggestive identification procedures, and engaging in leading, coercive and/or unduly suggestive questioning of witnesses, among other things. These were widespread, clear, and persistent patterns and practices of officers in the Department.

186. These widespread practices were so well-settled as to constitute *de facto* policy in the East Cleveland Police Department, and they were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying them.

187. Furthermore, the Defendant City and the Department declined to implement any or adequate policies or training on officers' obligation to preserve and disclose exculpatory and impeachment evidence, including notes, the

34

fabrication of evidence or police reports, the obligation not to provide details of crimes to witnesses, interviews of juvenile witnesses, or unduly suggestive identification or photo array procedures, among other things, even though the need for policies and training on such topics was obvious, and the failure to do so would lead to violations of constitutional rights. The decision not to implement any or adequate policies or training in these areas also contributed to the widespread practices described above.

188.    The Defendant City and the Department also declined to implement any legitimate mechanism for oversight or punishment of officers who violated their obligations, thereby leading officers to believe that they could violate citizens' constitutional rights with impunity.

189.    At all times relevant herein, final policymakers for the City and the Department knew of these problems, allowed them to continue, and made decisions not to implement adequate policies, training, supervision, or discipline.

190.    The constitutional violations complained of by Plaintiff were a highly predictable consequence of a failure to equip East Cleveland police officers with the specific tools—including policies, training and supervision—to handle the recurring situations of how to handle, preserve and disclose exculpatory and impeachment evidence, how to conduct juvenile witness interviews, how to conduct witness identification procedures, including photo arrays or lineups, and how to write police reports or notes of witness statements, among other things.

191.    In addition, the misconduct described herein was undertaken pursuant to the policy and practice of the Defendants City and County in that the violation of Plaintiff's rights was committed by the relevant final policymaker for the City or County, or the persons to whom final policymaking authority had been delegated.

192.    Defendants City and County are liable because the violation of Plaintiff's rights as described in this Count was caused by the policies, practices, customs, and/or actions of final policymakers for these Defendants.

193.    As a direct and proximate result of the Defendants' actions, Plaintiff's constitutional rights were violated and they suffered injuries, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, economic damages, and other grievous and continuing injuries and damages as set forth above.

## Count II: Federal Law – Fourth and Fourteenth Amendments
## Due Process and Continued Detention Without Probable Cause

194.    Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

195.    In the manner described more fully above, the Defendant Officers, acting individually, jointly, and in conspiracy with each other, accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence to institute and continue the judicial proceedings. The Defendant Officers made,

instigated, influenced, or participated in the decision to prosecute Plaintiff, and criminal proceedings were commenced against the Plaintiff.

196.    There was no probable cause for the criminal prosecutions of Plaintiff.

197.    In doing so, the Defendant Officers caused Plaintiff to be unreasonably seized without probable cause and deprived of their liberty, in violation of their rights secured by the Fourth and Fourteenth Amendments. Plaintiff suffered a continued deprivation of liberty apart from their initial seizures.

198.    Plaintiff's criminal prosecution was terminated in their favor, in a manner indicative of innocence.

199.    Absent Defendant Officers' misconduct, there would have been no probable cause for Plaintiff's continued detention, and the prosecution of Plaintiff could not and would not have been pursued.

200.    This misconduct also caused Plaintiff to be wrongfully convicted of crimes of which they are innocent.

201.    Additionally, the constitutional injuries complained of herein were proximately caused by the intentional misconduct of the supervisory defendants, including Defendants Teel and Lane, or when they were deliberately, recklessly indifferent to their subordinates' misconduct, knowing that turning a blind eye to that misconduct would necessarily violate Plaintiff's constitutional rights.

202.     Specifically, these supervisory defendants, including Defendants Teel and Lane, were aware of and facilitated, condoned, and oversaw the unconstitutional measures used by other Defendants or were deliberately, willfully, or recklessly indifferent to their subordinates' unconstitutional tactics.

203.     Additionally, in the manner described more fully above, the Defendant Officers, and Defendants Marino, Naiman and Dunn deliberately engaged in arbitrary and conscience-shocking conduct that contravened fundamental canons of decency and fairness and violated Plaintiff's substantive due process rights under the Fourteenth Amendment.

204.     The Defendants were acting under color of law and within the scope of their employment when they took these actions.

205.     Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendants City and County, in the manner described more fully above.

206.     As a direct and proximate result of the Defendants' actions, Plaintiff's constitutional rights were violated and they suffered injuries, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, economic damages, and other grievous and continuing injuries and damages as set forth above.

### Count III: Federal Law – Denial of Access to Courts

207.   Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

208.   In the manner described more fully above, Defendants Marino, Naiman, Dunn, and Defendant Officers wrongfully and intentionally concealed information crucial to Plaintiffs' ability to obtain redress through the courts, and did so for the purpose of frustrating that right. Defendants Marino, Naiman, Dunn, and Defendant Officers' actions violated Plaintiff's First, Fourth, Fifth, and Fourteenth Amendment rights, as well as Article IV of the Privileges and Immunities Clause of the U.S. Constitution.

209.   Defendants Marino, Naiman, Dunn, and Defendant Officers knew that Plaintiff sought the police and investigatory records of the Hudson murder from the City of East Cleveland because they maintained their innocence and were trying to obtain information that would assist them in filing motions for new trial, post-conviction or habeas relief, or other redress in the courts.

210.   Defendants Marino, Naiman, Dunn, and Defendant Officers knew that without the evidence in the Department's file on the Hudson murder, Plaintiff would not be able to obtain post-conviction, habeas, or other relief in the state or federal courts.

211.    Defendants Marino, Naiman, Dunn and Defendant Officers concealed this crucial information from Plaintiff wrongfully and intentionally for the purpose of frustrating Plaintiff's right to obtain post-conviction, habeas or other relief in the state and federal courts. This concealment and the delay engendered by it prevented Plaintiff's obtaining the relief to which they were otherwise entitled for an additional 17 years.

212.    If it had not been for Defendants Marino, Naiman, Dunn, and Defendant Officers' interference with the City of East Cleveland's response to the public records request, the City of East Cleveland would have released the police reports and investigatory records back in 1998, just as it did when post-conviction counsel requested it in 2013.

213.    If Plaintiff had received the exculpatory police reports at the time of their request in 1998, they could have filed motions for new trial and petitions for post-conviction relief alleging the violation of their due process rights based on the withholding of the police reports containing material, exculpatory evidence from the Petty brothers and Derek Bufford.

214.    If Plaintiff had access to the evidence concealed from them by the Defendants, Plaintiff's underlying claims would have been successful at that time, just as they were ultimately successful when they litigated a new trial motion using the exculpatory evidence.

215.    As a result of Defendants Marino, Naiman, Dunn, and Defendant Officers' misconduct, Plaintiff suffered substantial prejudice to their ability to obtain relief in state and federal court. Plaintiff lost motions for new trial, petitions for post-conviction relief, and petitions for habeas relief which they litigated from 1999 to 2013 without the exculpatory police reports. Defendants' misconduct rendered any available state court remedy ineffective.

216.    As a result of Defendants' misconduct, Plaintiff spent an extra 17 years incarcerated until the City of East Cleveland released the reports in response to Plaintiff's public records request. The relief that Plaintiff would have sought on their underlying due process claim is now otherwise unattainable because they can never regain those years that they lost. Plaintiff's injury caused by Defendants Marino, Naiman, and Dunn can only be remedied completely through this denial-of-access claim against them seeking damages.

217.    The Defendants were acting under color of law and within the scope of their employment when they took these actions.

218.    Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendants City and County, in the manner described more fully above.

219.    As a direct and proximate result of the Defendants' actions, Plaintiff's constitutional rights were violated and they suffered injuries, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering,

41

economic damages, and other grievous and continuing injuries and damages as set forth above.

## Count IV: Federal Law – Failure to Intervene

220.   Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

221.   In the manner described more fully above, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiffs' constitutional rights, even though they had the opportunity to do so. That is, the Defendants observed or had reason to know that Plaintiffs' constitutional rights were being or would be violated, and they had both the opportunity and the means to prevent harm from occurring.

222.   The Defendants were acting under color of law and within the scope of their employment when they took these actions.

223.   Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendants City and County, in the manner described more fully above.

224.   As a direct and proximate result of the Defendants' actions, Plaintiffs' constitutional rights were violated and they suffered injuries, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, economic damages, and other grievous and continuing injuries and damages as set forth above.

42

## Count V: Federal Law – Conspiracy to Deprive Constitutional Rights

225.   Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

226.   Prior to Plaintiff's conviction, all of the Defendant Officers, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime they did not commit and thereby to deprive them of their constitutional rights, in the manner described more fully above. Together, through numerous conversations, the Defendant Officers fabricated evidence, withheld and destroyed evidence, manipulated witnesses' statements and testimony, and unlawfully undermined Plaintiff's defenses.

227.   Defendants Marino and Naiman, acting in concert with other co-conspirators, known and unknown, including but not limited to the Defendant Officers and Defendant Dunn, reached an agreement among themselves to withhold exculpatory evidence from Plaintiff, deny Plaintiff's access to the courts, and deprive them of due process, thereby depriving them of their constitutional rights, in the manner described more fully above.

228.   In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability by depriving Plaintiff of these rights.

43

229.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity, in the manner described more fully above.

230.    The Defendants were acting under color of law and within the scope of their employment when they took these actions.

231.    As a direct and proximate result of the Defendants' actions, Plaintiff's constitutional rights were violated and they suffered injuries, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, economic damages, and other grievous and continuing injuries and damages as set forth above.

### Count VI: Ohio Law – Malicious Prosecution

232.    Each paragraph of this Complaint is incorporated as if restated fully herein.

233.    In the manner described more fully above, the Defendant Officers, acting maliciously, individually, jointly, and in conspiracy with each other, instituted or continued the prosecution of Plaintiff without probable cause. As a consequence of the criminal prosecution, Plaintiff was unlawfully seized, deprived of liberty, and wrongfully convicted of a crime of which they are innocent. Plaintiff's criminal prosecution was terminated in their favor in a manner indicative of innocence.

234.    The Defendant Officers accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

235.    The Defendant Officers were acting under color of law and within the scope of their employment when they took these actions.

236.    Through the doctrine of *respondeat superior*, Defendant City is liable as principal for all state law torts committed by its employees or agents, including the misconduct by Defendant Officers described in this Count.

237.    As a direct and proximate result of the Defendants' actions, Plaintiff's constitutional rights were violated and they suffered injuries, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, economic damages, and other grievous and continuing injuries and damages as set forth above.

### Count VII: Ohio Law – Intentional Infliction of Emotional Distress

238.    Each paragraph of this Complaint is incorporated as if restated fully herein.

239.    In the manner described more fully above, Defendants, acting individually, jointly, and in conspiracy with each other, intentionally or recklessly engaged in extreme and outrageous conduct that caused Plaintiff serious, severe

45

emotional distress as well as bodily harm. The Defendants' misconduct was the actual and proximate cause of Plaintiff's emotional distress and bodily harm.

240.   The Defendants were acting under color of law and within the scope of their employment when they took these actions.

241.   Through the doctrine of *respondeat superior*, Defendants City and County are liable as principal for all state law torts committed by their employees or agents, including the misconduct by Defendants described in this Count.

242.   As a direct and proximate result of the Defendants' actions, Plaintiff's constitutional rights were violated and they suffered injuries, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, economic damages, and other grievous and continuing injuries and damages as set forth above.

## Count VIII: Ohio Law – Civil Conspiracy

243.   Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

244.   In the manner described more fully above, the Defendants, acting in concert with other known and unknown co-conspirators in a malicious combination, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

245.    In the manner described more fully above, in furtherance of the conspiracy, the Defendants committed overt acts and were otherwise willful participants in joint activity including but not limited to the malicious prosecution of Plaintiff, the intentional infliction of emotional distress upon them, the denial of their access to courts, and the deprivation of their due process rights.

246.    The Defendants were acting under color of law and within the scope of their employment when they took these actions.

247.    Through the doctrine of *respondeat superior*, Defendants City and County are liable as principal for all state law torts committed by their employees or agents, including the misconduct by Defendants described in this Count.

248.    As a direct and proximate result of the Defendants' actions, Plaintiff's constitutional rights were violated and they suffered injuries, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, economic damages, and other grievous and continuing injuries and damages as set forth above.

## Count IX: Ohio Law – Tortious Interference

249.    Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

250.   In the manner described more fully above, Defendants Naiman, Marino, Dunn, and Defendant Officers tortiously interfered with evidence and tortiously interfered with Plaintiff's legal remedies because they withheld and concealed the exculpatory evidence discussed above, including the police reports on the Petty brothers and Derek Bufford, from Plaintiff.

251.   At the time of Defendants' actions in 1998, there was probable litigation involving the Plaintiff because they were conducting initial investigation into potential post-conviction claims by submitting a public records request to the East Cleveland Police Department; Defendants Naiman, Marino, Dunn, and Defendant Officers knew that such litigation was probable; Defendants Naiman, Marino, Dunn, and Defendant Officers willfully concealed or interfered with the disclosure of the exculpatory police reports, which was designed to disrupt Plaintiff's case; and Plaintiff's post-conviction and habeas litigation was disrupted as a result.

252.   In the manner described more fully above, Defendants Naiman, Marino, Dunn, and Defendant Officers did not merely withhold the exculpatory police reports, but they actively interfered with Plaintiff's public records request to the City of East Cleveland in order to prevent the reports from being disclosed and to conceal the existence of the reports.

253.   The Defendants were acting under color of law and within the scope of their employment when they took these actions.

254.   Through the doctrine of *respondeat superior*, Defendants City and County are liable as principal for all state law torts committed by their employees or agents, including the misconduct by Defendants described in this Count.

255.   As a direct and proximate result of the Defendants' actions, Plaintiff's constitutional rights were violated and they suffered injuries, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, economic damages, and other grievous and continuing injuries and damages as set forth above.

## Count X: Ohio Law – *Respondeat Superior*

256.   Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

257.   While committing the acts alleged in the preceding paragraphs, the Defendant Officers were employees and agents of the Defendant City, acting at all relevant times within the scope of their employment.

258.   While committing the acts alleged in the preceding paragraphs, Defendants Marino and Naiman were employees and agents of the Defendant County, acting at all relevant times within the scope of their employment.

49

259.    Defendants City and County are liable as principal for all state law torts committed by their agents.

## Count XI: Ohio Law – Indemnification

260.    Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

261.    Ohio law provides that the Defendants City and County are directed to pay any tort judgment for compensatory damages for which its employees are liable within the scope of their employment activities.

262.    The Defendants were employees of the Defendant City or County, as described above, and acted within the scope of their employment at all times relevant in committing the actions and omissions described herein.

WHEREFORE, Plaintiff, EUGENE JOHNSON, respectfully request that this Court enter a judgment in his favor and against Defendants CITY OF EAST CLEVELAND, former East Cleveland Police Detective Sergeant MICHAEL C. PERRY, former East Cleveland Police Detective VINCENT K. JOHNSTONE, former East Cleveland Police Detective D.J. MIKLOVICH, former East Cleveland Police Detective Sergeant PATRICIA LANE, former East Cleveland Police Commander CHARLES TEEL, former East Cleveland Police Lieutenant JOHN C. BRADFORD, former East Cleveland Police Sergeant TERRENCE DUNN, former First Assistant at the Cuyahoga County Prosecutor's Office CARMEN MARINO, and former Assistant County Prosecutor at the Cuyahoga County Prosecutor's

Office DEBORAH NAIMAN, and CUYAHOGA COUNTY, awarding compensatory damages, costs, and attorneys' fees against each Defendant, along with punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate.

Respectfully submitted,

MICHAEL B. PASTERNAK (0059816)
Park Center II
3681 South Green Road, Suite 411
Beachwood, Ohio 44122
(216) 360-8500
(216) 360-8501 Fax
Mpasternak1@msn.com

BRETT MURNER (0074363)
Murner Law Firm
208 North Main Street
Wellington, OH  44090
(440) 647-9505 – Phone
(440) 647-9506 - Fax
bmurner@yahoo.com
*Attorneys for Plaintiff*
*Eugene Johnson*

## JURY DEMAND

Plaintiff, EUGENE JOHNSON GLOVER, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.


MICHAEL B. PASTERNAK (0059816)
*Attorney for Plaintiff*
*Eugene Johnson*